UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ANDREW LEE KNIGHT** | **CIVIL ACTION** |
| **VERSUS** | **NO: 17-12456** |
| **KIRBY OFFSHORE MARINE, LLC ET AL.** | **SECTION "H"** |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff Andrew Lee Knight brings claims for damages he suffered in an accident that occurred while he was working as a tankerman aboard the M/V SEA HAWK, a vessel owned by Defendant Kirby Offshore Marine Pacific, LLC ("Kirby"). Plaintiff brings a negligence claim under the Jones Act and an unseaworthiness claim under the general maritime law against Defendant Kirby, his employer. This matter went to trial February 19 through 20, 2019. Having considered the evidence admitted at trial and the arguments of counsel, this Court makes the following findings of fact and conclusions of law. To the extent a finding of fact constitutes a conclusion of law, and vice versa, the Court adopts it as such.

# FINDINGS OF FACT

1. Kirby, a marine transport company, owned and operated the M/V SEA HAWK, a tow boat.
2. At all material times, Plaintiff Andrew Knight was a Jones Act seaman employed by Kirby as an offshore tankerman.
3. Knight boarded the M/V SEA HAWK in December 2016 near Seattle, Washington for a voyage that involved towing a barge from Everett, Washington to Dutch Harbor, Alaska.
4. The M/V SEA HAWK was captained by Alan Ryan, a Kirby employee, during its voyage from Everett to Dutch Harbor.
5. The M/V SEA HAWK stopped at various ports along its voyage including Vancouver, British Columbia; Anacortes, Washington; Port Angeles, Washington; Hoonah, Alaska; and Dutch Harbor, Alaska.
6. The M/V SEA HAWK last stopped in Hoonah, Alaska before reaching Dutch Harbor.
7. Aboard the M/V SEA HAWK during this voyage was a stern line used by the crew to secure the barge to the tow boat when entering and exiting ports. The stern line was not used in open water.
8. The stern line was firm, several inches thick, and more than 100 feet long.
9. Captain Ryan conducted an inspection of the stern line in Everett and at that time the stern line appeared slightly used but not chafed.
10. Once the stern line becomes chafed it is important to change the line at the earliest possible time that it is safe to do so.
11. Captain Ryan inspected the stern line as it was being used to secure the barge to the M/V SEA HAWK during the tow boat's entrance into Hoonah, and at that time the stern line was in good condition.

12. The stern line was used to secure the barge to the M/V SEA HAWK while the tow boat was in Hoonah.
13. While the M/V SEA HAWK was anchored in Hoonah, a storm blew in. The storm produced five-foot seas and winds of 60 miles per hour.
14. While the stern line was being used in Hoonah, the rough weather conditions caused the line to chafe.
15. After the M/V SEA HAWK left Hoonah, the stern line was hauled back onto the tow boat.
16. Crew members should inspect the stern line every time there is an opportunity to do so. Captain Ryan testified, however, that it was company policy to inspect the lines before entering a port but not when leaving a port.
17. The crew had an opportunity to inspect the stern line before the M/V SEA HAWK departed Hoonah.
18. Captain Ryan should have known that the line was chafed before the M/V SEA HAWK departed Hoonah.
19. The stern line could have been changed while the M/V SEA HAWK was in Hoonah.
20. The stern line also could have been changed shortly after the M/V SEA HAWK left Hoonah.
21. The M/V SEA HAWK departed Hoonah sometime before January 1, 2017.
22. On January 6, 2017, the M/V SEA HAWK was a vessel operating in the navigable waters of the United States near Alaska's Kenai Peninsula.

23. On January 6, 2017, the weather conditions where the M/V SEA HAWK was located included four-foot seas and winds of at least 20 miles per hour.
24. The M/V Sea Hawk tended to roll in rough conditions.
25. Captain Ryan ordered Knight and Second Mate Donald Ladd to replace the chafed stern line with a new stern line while the M/V SEA HAWK was rolling in these conditions on January 6, 2017.
26. There were safer times during which the stern line could have been changed.
27. It would have been safer to change the stern line either in Hoonah or shortly after departing Hoonah.
28. The chafed stern line was wrapped around a winch at the time Captain Ryan ordered Knight and Ladd to change it. After Knight and Ladd unspooled the chafed line, the chafed line was placed on the deck near the winch.
29. While Knight and Ladd were placing a new line onto the winch, Knight stepped on the old line and rolled his ankle.
30. Knight was working in the course and scope of his employment with Kirby when he injured his ankle.
31. Captain Ryan was negligent in failing to order the stern line to be changed either in Hoonah or shortly after the tug boat departed from Hoonah.
32. Captain Ryan's negligence caused Knight's injury, but Ryan's negligence was not the sole cause of Knight's injury.
33. Knight had a duty to watch where he stepped while changing the stern line.

34. Knight was negligent in failing to avoid stepping on the chafed stern line while loading the new stern line onto the winch.
35. Knight also had a duty to execute Captain Ryan's order in a prudent manner.
36. Knight was negligent in failing to move the chafed stern line to a location on the boat where Knight would not have been in danger of stepping on it while loading the new stern line onto the winch.
37. Knight's negligence contributed to his injury.
38. Captain Ryan was 50% at fault and Knight was 50% at fault for Knight's injury.
39. At the time of Knight's injury, he was 53 years old, living in Alabama, and earning $543 a day based on a daily rate of $536 plus $7 per day longevity pay. Also at that time Knight was receiving fringe benefits from Kirby in the form of 401k benefits plus dental, health, disability, and vision insurance.
40. In 2016, Knight earned $100,406.50 in gross wages in his capacity as an offshore tankerman for Kirby. He worked shifts of 35 days on and 35 days off.
41. After the M/V SEA HAWK reached Dutch Harbor and Knight ultimately returned to Alabama, Knight on January 23, 2017 saw Dr. William Park, IV, an orthopedic surgeon.
42. Dr. Park diagnosed Knight with a right posterior tibial tendon insufficiency caused by the rolling of his ankle aboard the M/V SEA HAWK on January 6, 2017, and Dr. Park ordered Knight to begin physical therapy treatment for his ankle.
43. On March 21, 2017, Dr. Park performed a surgical procedure that involved removing a piece of healthy tendon and inserting it into

Knight's weakened tendon to help strengthen the injured tendon. A screw and a washer were inserted into Plaintiff's ankle area during the procedure.

44. Following the procedure, Knight was in a short leg non-weight bearing cast until May 4, 2017, at which point the cast was removed and he was ordered to wear a boot.

45. Knight was in significant pain following the surgery.

46. On July 20, 2017, Dr. Park surgically removed the screw and washer from Knight's foot to alleviate Knight's pain.

47. On January 8, 2018, Dr. Park performed a surgical procedure intended to remove scar tissue surrounding the area in Knight's ankle where Dr. Park performed his initial surgery.

48. Dr. Park had never before performed this type of surgery—the removal of the scar tissue—but did so because of Knight's continued complaints of pain following the initial surgery and follow-up physical therapy.

49. Some scar tissue was removed from Knight's ankle during the January 8, 2018 procedure.

50. On January 23, 2018, Kirby terminated Knight because of his disability but specified in his Payroll Change Order Form that he was eligible for re-hire.

51. Knight reached maximum medical improvement on June 1, 2018.

52. Knight cannot return to work as an offshore tankerman.

53. Kirby and other companies employ onshore tankerman. That position involves less strenuous work than that of offshore tankerman.

54. Knight is capable of working as an onshore tankerman.

55. Since injuring his ankle aboard the M/V SEA HAWK, Knight has not submitted any applications for jobs as an offshore tankerman, an onshore tankerman, or any other type of job.
56. Nancy Favaloro, Plaintiff's Vocational Rehabilitation Expert, testified that onshore tankerman earn roughly $50,000 per year. Todd Capielano, Defendant's Vocational Rehabilitation Expert, testified that onshore tankerman earn roughly $67,000 to $75,000 per year.
57. This Court finds that Knight was capable of returning to work as of June 1, 2018 earning 75% of his former income.
58. This Court finds that Knight's appropriate wage base is $99,008, which represents his gross wages minus work expenses.
59. This Court finds that Knight's worklife expectancy is 64.3 years of age.
60. This Court finds that Knight suffered no loss in future fringe benefits—except for his 3% employer match for 401k contributions—because of his ability to return to work as an onshore tankerman.
61. Knight's total past economic loss is $103,037.
62. Knight's total future economic loss is $180,581, which includes a loss of 3% in matching 401k contributions.
63. Knight's total economic loss is $283,618.
64. Knight testified that since his injury he has trouble doing house chores, walking, fishing, and playing sports with his sons.

## CONCLUSIONS OF LAW

Jones Act claim

1. The Jones Act creates a cause of action for negligence when a seaman is injured in the course of his employment. *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 416 (2009).

2. "An employer is liable under the Jones Act if the negligence of its employees played any part, even the slightest in causing the injury or death for which damages are sought. Even so, the Fifth Circuit clarified that the employer's standard of care is not greater than that of ordinary negligence under the circumstances. A Jones Act employer is not an insurer of a seaman's safety; the mere occurrence of an injury does not establish liability." *Stowe v. Moran Towing Corp.*, 995 F. Supp. 2d 570, 575 (E.D. La. 2014) (internal citation omitted).

3. "A Jones Act employer has the duty to provide his seaman employees with a reasonably safe place to work, including providing reasonably suitable gear." *Fluker v. Manson Gulf, LLC*, 193 F. Supp. 3d 668, 674 (E.D. La. 2016).

4. At all material times, Kirby was Knight's Jones Act employer, and Knight held seaman status.

5. "Contributory negligence is an affirmative defense that diminishes recovery in proportion to the seaman's fault. To establish that a seaman is contributorily negligent, an employer must prove negligence and causation." *Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 302 (5th Cir. 2008). "A seaman is negligent if he fails to act with ordinary prudence under the circumstances." *Id.* "To establish causation, an employer must show that a seaman's negligence played any part, even the slightest, in producing the injury." *Id.* (internal quotation omitted).

6. Defendant Kirby was negligent when Captain Ryan ordered Plaintiff Knight to change the chafed stern line while the M/V SEA HAWK was rolling in four-foot seas even though there were safer times to issue

the order to change the line and Captain Ryan should have known to change the line during one of the safer times.

7. Plaintiff Knight was negligent in failing to watch his footing while replacing the chafed stern line and in failing to move the chafed stern line to a location on the boat where he would not have stepped on it while placing the new stern line on the winch.

8. Fault is apportioned 50% to Defendant and 50% to Plaintiff.

<u>Unseaworthiness claim</u>

9. "A shipowner has an absolute nondelegable duty to provide a seaworthy vessel." *Jones v. United States*, 326 F. Supp. 3d 262, 270 (E.D. La. 2018) (quoting *Brister v. A.W.I., Inc.*, 946 F.2d 350, 355 (5th Cir. 1991)).

10. "To recover under an unseaworthiness theory, 'the injured seaman must prove that the owner has failed to provide a vessel, including her equipment and crew, which is reasonably fit and safe for the purposes for which it is to be used.'" *Id.* (quoting *Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001)). "In addition, the plaintiff must establish a causal connection between his injury and the breach of duty that rendered the vessel unseaworthy." *Id.* (quoting *Jackson*, 245 F.3d at 527).

11. "The standard of causation for an unseaworthiness claim is 'more demanding' than the Jones Act standard, 'and requires proof of proximate cause.'" *Id.* (quoting *Chisholm v. Sabine Towing & Transp. Co., Inc.*, 679 F.2d 60, 62 (5th Cir. 1982)). "To establish proximate cause, 'a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and

that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness.'" *Id.* (quoting *Brister*, 946 F.2d at 355).

12. Assuming that the M/V SEA HAWK was unseaworthy because the chafed stern line was not reasonably fit for its intended use (securing the tow boat to the barge on January 6, 2017), that unseaworthiness was not the proximate cause of Plaintiff Knight's injury. Knight's ankle injury was neither a direct result nor a reasonably probable consequence of the existence of the chafed stern line aboard the M/V SEA HAWK on January 6, 2017.

<u>Damages</u>

13. "An injured seaman may recover damages for loss of earnings capacity, future lost earnings, medical expenses, and pain and suffering resulting from his injury." *Pallis v. United States*, 369 F. App'x 538, 544 (5th Cir. 2010).

14. General damages are available "for pain and suffering and impact on one's normal life routines." *Barto v. Shore Const., L.L.C.*, 801 F.3d 465, 473 (5th Cir. 2015).

15. Based on Plaintiff's continued complaints of pain and discomfort and Dr. Park's finding that Plaintiff suffered a 10% lower extremity permanent partial impairment because of his injuries, this Court finds that an award of $60,000 for Plaintiff's past and future general damages for pain and suffering is appropriate.

16. Plaintiff's damages for past, after-tax loss of earnings from the time of his injury until maximum medical improvement amount to $103,037.

17. To determine lost future earnings, the Court must "estimat[e] the loss of work life resulting from the injury or death, calculat[e] the lost income stream, comput[e] the total damage, and discount[ ] that amount to its present value. [C]alculation of the lost income stream begins with the gross earnings of the injured party at the time of injury." *Mayne v. Omega Protein Inc.*, 370 F. App'x 510, 517 (5th Cir. 2010).

18. Plaintiff's damages for future loss of earning capacity amount to $180,581.

19. Plaintiff's total damages amount to $343,618.

20. Because this Court finds that Plaintiff was 50% at fault for his injuries, his total damages are reduced by 50% to $171,809.

21. "When a Jones Act case is brought under the court's admiralty jurisdiction and hence, the case is tried to the court and not to a jury, an allowance of prejudgment interest is within the discretion of the trial court, even if there is not a finding of unseaworthiness." In re *Par. of Plaquemines as Owner of M/V POINTE-A-LA-HACHE for Exoneration from or Limitation of Liab.*, 231 F. Supp. 2d 506, 515 (E.D. La. 2002).

22. The Court finds that an award of prejudgment interest on Plaintiff's past damages is appropriate in this case because prejudgment interest is favored in maritime cases and more than two years have passed since Plaintiff suffered his injury. Jauch v. Nautical Servs., Inc., 470 F.3d 207, 215 (5th Cir. 2006) ("Indeed, it is generally accepted that, under maritime law, the award of prejudgment interest is 'well-nigh automatic.'") (quoting Reeled Tubing, Inc. v. M/V CHAD G, 794 F.2d 1026, 1028 (5th Cir. 1986)).

23. The prejudgment interest shall be calculated at a rate of 4% per annum from the date of Plaintiff's injury—January 6, 2017—until paid. An award of postjudgment interest at the applicable government rate shall apply to Plaintiff's total damages from the date of judgment until paid. *See* Weeks Marine, Inc. v. Watson, 190 F. Supp. 3d 588, 599 (E.D. La. 2016).

## **CONCLUSION**

For the foregoing reasons, Plaintiff is entitled to judgment against Defendant Kirby on his Jones Act negligence claim in the amount of $171,809 plus applicable prejudgment and postjudgment interest. Defendant Kirby is entitled judgment in its favor on Plaintiff's general maritime law unseaworthiness claim.

New Orleans, Louisiana this 10th day of May, 2019.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**